IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


SHELLY R. SMITH,

                    Plaintiff,

          v.                                          Civil Action No.3:07-CV-67


MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.      Background

          Plaintiff, Shelly Smith, (Claimant), filed her Complaint on June 1, 2007 seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on August

2, 2007.[2]  Claimant filed her Motion for Summary Judgment on August 29, 2007.[3]

Commissioner filed his Motion for Summary Judgment on October 26, 2007.[4]  Claimant filed

her response to the Commissioner's Motion on November 9, 2007.[5]

B.      The Pleadings

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 12.

[4] Docket No. 15.

[5] Docket No. 16.

1.      Plaintiff's Brief In Support of Motion for Summary Judgment.

2.      Defendant's Brief In Support of Judgment on the Pleadings.

3.      Plaintiff's Response to Defendant's Motion for Summary Judgment.

C.      Recommendation

I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED because the ALJ's determination of Claimant's credibility and resulting RFC was based in part on an improper characterization of Claimant's lifestyle evidence.  Additionally, the ALJ failed to sufficiently document his consideration of Dr. Gingold's medical records.  As a result of his failure, the Court cannot determine whether the ALJ's findings regarding Claimant's RFC are supported by substantial evidence.  The Court makes the above recommendation recognizing it's role is to ensure the ALJ accurately considered all relevant evidence in arriving at his decision, not to suggest what his decision should be upon consideration of the evidence.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons stated above.

## II.  Facts

A.      Procedural History

Claimant filed an application for Disability Insurance Benefits on January 20, 2005, alleging disability since March 1, 1999 stemming from chronic headaches.  Her application was initially denied on April 4, 2005 and upon reconsideration on October 12, 2005.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing via video on September 26, 2006.  On November 24, 2006, the ALJ issued a decision adverse to

Claimant.  Claimant requested review by the Appeal Council and submitted additional evidence

in support of her appeal.  The Appeals Council denied review and Claimant filed this action,

which proceeded as set forth above.

B.      Personal History

        Claimant was 20-years-old on the date of the September 26, 2006 hearing before the

ALJ.  Claimant completed high school and has no prior work activity.

C.      Medical History

        The following medical history is relevant to the time period during which the ALJ

concluded Claimant was not under a disability: March 1, 1999 through November 24, 2006.

**United Hospital Center, 11/10/04, (Tr. 124)**
MRI was performed without gadolinium in evaluation of headaches.  There is no evidence of
intracranial mass, mass-effect, or edema.  The sinuses appear clear.

**Dr. Monique Gingold, M.D., 11/17/04, (Tr. 125)**
-She now has one severe headache a week during which she must lie down and 3 somewhat
smaller headaches per week. This has improved from the last month when she was having two
severe headaches a week and 5 total per week.

-Physical exam is once again unremarkeable, generally and neurologically.

-In summary, this young lady has intractable migraines in spite of being on numerous
medications for good trial periods.  This is actually a good period for Shelly.  However, she is
still unable to work for more than two hours a day.  I recommend applying for disability and
have renewed her medications and provided as many samples as I can since this is her last month
of having a medical card.  I will see Shelly back in three months though she may wish to follow
up locally.

**Dr. Monique Gingold, M.D., 3/12/03, (Tr. 127)**
-Physical exam is once again unremarkable, generally and neurologically.

-In summary, this young lady has either failed prophylaxis or developed untoward unacceptable
adverse effects to medication.  During today's visit, father and Shelly both cried. . . .  I have
instructed Shelly to try, again, to increase the Topamax to 50 mg.  Should she not tolerate this, I
have provided her with a prescription for Elavil 10 mg hs with instructions to increase the dose
to 20 mg in 7 days should the headache persist.  She will call me in 2 weeks and should she have

improved, I will further adjust the dose.  I will see her back in 5 weeks.


**Dr. Monique Gingold, M.D., 1/14/03, (Tr. 128)**
-Shelly says the Neurontin has diminished the headache frequency to once a week and the intensity is lessened as well. She has not identified any headache triggers.  The only complaint now is that 2-3 hours after the morning dose, she is sleepy.  In the evening, however, she feels the medicine awakens her.  She is now taking 1 hour to fall asleep.

-Physical exam is once again unremarkable, generally and neurologically.

-In summary, this young lady has responded well to migraine prophylazis.  I recommend decreasing the am dose to 300 mg and continuing with 600 mg pm dose but advance the dose to 6pm to see if this would less affect her sleep.  I am puzzled since the medicine should not cause her both to be sleepy and alert.  She may also try Melatonin 3 mg for sleep difficulties and I will see her back in 2 months.

**Dr. Monique Gingold, M.D., 11/25/02, (Tr. 129)**
-In the last few months, Shelly has started having headaches 2-3 times per week of varying severity.  She has a severe headache, rated 6-7/10 and occasionally 10/10, every two weeks.  She has smaller headaches rated 4/10 twice a week.

-Physical examination reveals a non-dysmorphic young lady with normal growth parameters.  The general examination was normal as was the neurological exam including mental status, speech, cranial nerves including an examination of the fundus, gait, coordination, sensory, tone, motor, deep tendon reflexes and plantar responses.

-In summary, this young lady has migraine headaches which are familial.  Educational materials were provided and we discussed possible headache triggers, in her case caffeine.  I am starting her on Neurontin, gradually working up to 600 mg bid.  Adverse effects were discussed and all questions answered. I have instructed her to try Imitrex 100 mg for break through headaches.  Should that not be effective, I have provided her with samples of Frova 2.5 mg to try.  I will be back in Bridgeport in mid January.

**Dr. Zubaer M. Dawlah, M.D., 12/27/04, (Tr. 130)**
-<u>Past Medical History</u>: migraine for the last 3-4.  Currently she is getting treatment from pediatric neurologist at WVU (Dr. Gingold) and currently taking Kerlone SR 180mg daily, Imitrex 100 mg prn for migraine, Topamax 25 mg 3 tabs daily, Zonegran 100 mg 2 capsules daily.  The patient states that in spite of this that she gets headache almost 5 out 7 days a week.  However, the patient states that most of these headaches are not as severe or deliberating.

4

-<u>Assessment</u>: history of migraine.

-<u>Plan</u>: 1) Continue current meds. 2) A MAP application folder was given to the patient to see the social worker. 3) For continuity of care we would like to obtain her previous records from Dr. Gingold.

**DDS Physician, 3/31/05, (Tr. 131)**
<u>Physical Residual Functional Capacity Assessment</u>
-Exertional Limitations: none established
-Postural Limitations: never climb ladder/rope/scaffolds (migraine headache)
-Manipulative Limitations: none established
-Visual Limitations: none established
-Communicative Limitations: none established
-Environmental Limitations:
      -Extreme cold: avoid concentrated exposure
      -Extreme heat: avoid concentrated exposure
      -Wetness: unlimited
      -Humidity: unlimited
      -Noise: avoid concentrated exposure
      -Vibration: avoid concentrated exposure
      -Fumes, odors, dusts, gases, poor ventilation, etc: avoid concentrated exposure
      -Hazards (machinery, heights, etc): avoid concentrated exposure
      -Describe how these environmental factors impair activities and identify hazards to be avoided. Also, explain how and why evidence supports your conclusions in items 1 through 8. Cite the specific facts upon which your conclusions are based: Above limitations secondary to migraine headaches.
-Symptoms:
      -ADLs: claimant does not report any deficiencies in ADLs, except: When having a headache, stays in bed and can only sleep. Completing tasks and concentration suffer due to headache. Reports she does not socialize, go out as much, and cannot make plans, but she has had this complaint and treatment since November 2002.
      -Pain: Headaches, Describes as stabbing and throbbing. Occurs 4-5 times a week. Sometimes lasts for a couple of hours and other times lasting for days. Light, noise, and sometimes movement makes the pain worse. Sleep helps pain and pain medication.
      -Meds: Imitrex injection PRN, Imitrex pills PRN, Metoclopram, Aleve.
      -The claimant is credible. She does not allege any difficulties other than those related to headaches. She does not report physical difficulties that are not related to the allegation. Her statements are consistent with the treatment and doctor's notes in the record.
      -Claimant with migraine headaches. She needs to avoid trigger which can cause migraine headaches. Also avoid heights, hazards and unprotected climbing.
-Treating or Examining Source Statements:

-Monique Gingold, M.D., in a letter dated 11/17/2004, recommended the claimant file for disability, but there is no statement regarding physical capacity or limitations.
-As the headaches are better under treatment, I feel patient can likely work, but needs to avoid heights/hazards and unprotected climbing and avoid potential triggers that can cause headaches.

**DDS Physician, 10/6/05, (Tr. 141)**
Physical Residual Functional Capacity Assessment
-Exertional Limitations:
      Occasionally: 50 lbs
      Frequently: 25 lbs
      Stand and/or walk: about 6 hours in an 8-hour workday
      Sit: about 6 hours in an 8-hour workday
      Push and/or pull: unlimited, other than as shown for lift and/or carry.
-Postural Limitations: never climb ladder/rope/scaffolds
-Manipulative Limitations: none established
-Visual Limitations: none established
-Communicative Limitations: none established
-Environmental Limitations:
      -Hazards (machinery, heights, etc): avoid all exposure
      -Describe how these environmental factors impair activities and identify hazards to be avoided.  Also, explain how and why evidence supports your conclusions in items 1 through 8.  Cite the specific facts upon which your conclusions are based: Above limitations secondary to migraine headaches.
-Symptoms: Medical evidence indicates Claimant does have migraine headache but not to the point that equals or meets Listings.

**Milan Puskar Health Facility, 3/24/06, (Tr. 152)**
Symptoms: States her migraines occur approximately 4 times per week and are triggered by heat and light.  Reports medications keep her from having headaches more often.

Assessment/Plan: 1) Migraines, currently uncontrolled. Continue topamax, lexapro, imitrex as prescribed by PCP.  Referral placed for neurology at WVU. 2) Health maintenance.

**Christopher Nance, M.D., 4/14/06, (Tr. 156)**
We saw your patient today for her vascular headaches.  She has a history of vascular headaches right now that are controlled with Topamaz 75 mg twice a day and taking Imitrex or Maxalt when she has breakthrough episodes.  We are going to continue this medication with her at this time.  She also had an MRI of her brain done at UHC, which was essentially negative.

**Dr. Zubaer M. Dawlah, M.D., 3/15/06, (Tr. 166)**

-The patient states she is still having frequent problems of migraine about one or two episodes per week.

-<u>Physical exam</u>: Temperature if 97, blood pressure is 92/73, pulse is 78, respirations 16, and weight is 125.4 lb.  Examination of eyes: pupils are equal and reactive to light.  On dilated examination of the fundus, do not show any acute findings.  Neck: No bruit, no lymphodenopathy.  Lungs have vesicular breath sounds.  There are no rales or rhonchi.  Heart: regular rhythm, there is no murmur.

<u>Assessment</u>: 1) Migraine.  2) Depression.

<u>Plan</u>: 1) We will continue the patient on current medications.  2) The patient is going to see a social worker.

D.       <u>Testimonial Evidence</u>

Testimony was taken at the September 26, 2006 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 181)

Q       Are you able to drive?

A       Yes.

Q       Any limits on your driving because of your condition?

A       Well, when I have a migraine there's no way I could drive but on days that I don't

I'm just like any other person.  I can drive.

Q       How did you get to the hearing today in Bridgeport?

A       My mother drove.

Q       How much time did it take you to get to the hearing site from your home?

A       Probably an hour and 15 minutes, sir.

Q       Did you have any problems riding in a car today?

A       No, sir.

Q       Did you graduate from high school?

A       Yes.  I was home  schooled.

Q       Do you have a diploma?

A       Yes.  I went through a correspondence, so it's nationally accredited.

Q       Any training or schooling after high school?

A       No, sir.

Q       Can you read?

A       Yes, sir.

Q       Can you write?

A       Yes.

Q       Can you perform mathematical skills?  Addition, subtraction, things like that.

A       Yes.

Q       Have you ever worked?

A       No.

Q       I understand your application says you have migraine headaches and furthermore that you allege that there might be a depression or a mental condition.

A       I have migraine headaches and I have had them for a long time.  And a couple of months ago I went to my - - just a local physician in my town and did seek some medication for depression.  After you've had migraines for so long and it - - you just don't have any hope for the future.  You can't - - you're not dependable.  No one can depend on you, so I just got to feel

so down because of that.  So, the doctor did put me on a anti-depressant medication and I do feel more optimistic even just by the headaches because of that medication.

Q        So, I take it the headaches cause you pain?

A        Intense pain, yes.

Q        And it's located where?

A        On my forehead.  Always across the forehead.

Q        Does it go anywhere else?

                        *                *                *

Q        In a 30-day period how many days do you have headaches?

A        Well, sir, that's a very hard question.  I don't - - sometimes I go and I don't have a headache for you know, three days and one time I went and I had a headache for two weeks straight.  But I one time tried to figure it up and I'd say - - I'd have to say on an average I probably have headaches probably 12 days out of the month, sir, and those are bad ones. Because I often times find that I have headaches and I don't - - I have - - they're not migraines because there's a difference, sir, between migraines and just regular headaches.  Migraines are the debilitating kind and then there are regular headaches.  I can function with headaches but migraines are the kind that you get down and I can't do anything with those.  But I probably have migraines 12 days a month, sir.

                        *                *                *

Q        Okay.  Now, let's go over a few things with respect to your physical abilities.  Do you have any limitations on your ability to walk?

A       No, sir.

Q       Do you have any limitations on your ability to stand?

A       No, sir.

Q       Can you bend over, stoop down or squat?

A       Yes, sir.  I can do all of those things.

Q       Are you right-handed or left-handed?

A       I'm right-handed.

Q       Any problems with your hands, fists, fingers?

A       No, sir.

Q       Do you have feeling in both of your hands?

A       Yes, sir.

Q       Can you use your hands to dress yourself, button your clothes, hold a fork and spoon, things like that?

A       Yes, sir.

Q       Do you have any limitations on your ability to lift?

A       No, sir.  Not every day but whenever I have a headache there's no way I would do any kind of lifting or anything like that.   That would just make the migraine worse.   Any kind of lifting.

Q       Sitting like you are now.  Do you have any limit?

A       No, I don't.  But I'd just like to say whenever I have a migraine sitting or standing just makes it worse and I will get sick if I do that for any period of time, so laying down in the

only position that's comfortable.

*         *         *

Q       Do your headaches cause problems with your memory?

A       No, sir.   They don't.

Q       Are you able to watch television without difficulty?

A       With or without a headache or just generally?

A       Well, do they cause your headaches?

A       No, they do not cause headaches but if I have headaches there's no way I'd be caught watching a television.  But any other time of course I'd watch television.

Q       Do you have a computer?

A       Yes, sir.

Q       Is it connected to the Internet?

A       No, sir.

Q       Do you use a computer that's connected with the Internet?

A       At the library.  Yes, sir.

Q       How often?

A       Once every couple of weeks.

Q       Does it cause problems with headaches?

A       No, sir.

Q       And when you go to the library do you drive to the library and back to your home?

A       Sometimes.  Other times I go with my family.  It depends.

Q       Do you have difficulty being around crowds of people?

A       No, sir.

Q       Do you have problems dealing with strangers?

A       No, sir.

*                *                *

Q       Do you have any difficulty taking care of your personal hygiene, shower, bathing, dressing, toilet, things like that?

A       No, sir.

Q       Do you eat out a lot?

A       No, sir.

Q       How do you get your meals?

A       Can you explain the question?

Q       Do you cook?

A       Yes.  I live - - yes, sometimes.

Q       You live alone or with your parents?

A       With my parents.

Q       Does your mother provide meals as well?

A       Yes, she does.

*                *                *

Q       On a typical day how do you spend your time?

A       Well, if I have - - if wake up with as headache then I'll go and take my daily pills

12

and then I'll take my pain pills and I'll go back to bed and because that's what I have to do. And depending on how bad the headache is I'll sleep accordingly. Some - - I mean, I've been known to sleep until you know, 4:00 in the day and sometimes I'll just get up a couple hours later because my headaches gone. Because whenever I take those pain pills they just make my - - make me sleep. And it's like my body's telling me I have to sleep to get rid of the headache too. But if I don't have a headache then I just live like a normal person. I enjoy - - I have a flower garden. I like to do that. And I enjoy sewing. And I like to read so I do that. So, I do what I like whenever I don't have a headache and I take advantage of the days that I don't have a headache.

Q      When you don't have a headache what time are you out of bed in the morning?

A      Probably 8:30.

Q      Then what will you - -

A      9:00.

Q      - - do?

A      Well, I get up and get breakfast and my grandfather lives with us so we have to see to - - I help to see to him. And I help with the - -

Q      What do you do for him?

A      Well, I help get his breakfast. But I mean, he's not demanding. He takes care of his self but I mean, we entertain him and things like that but I mean, it's nothing demanding. But if I don't have a headache then all that's left to my mom or my sister and they understand.

Q      Do you have to bathe him? Do you have to dress him?

A      No.

Q      Do you - -

A      He does all of that himself.

Q      All right.  So after you have a breakfast what will you do?

A      Well, I just basically do the things I mentioned.  Garden and sew and - - because I don't - - I can't have a schedule because I never know when I'm going to feel good or when I'm not going to feel good so it's not like I can schedule to do activities with a group or anything. So, I just kind of have to do things that I can do any time.

                              *              *              *

Q      Do you do housework?

A      If I feel good sure.  Yeah, sure.  I do housework.

Q      What do you do?  Vacuum, dust, mop?

A      Yeah, if I feel okay.  If I don't have a headache I'm just like any normal person.  I do the dishes.  I - - yeah, I vacuum.  I you know, clean the house.  I'll do that.  But if I have a headache there's no way I'm going to do any of that and - -

Q      Do you go shopping?  You go to the mall?  You do things like that?

A      If I feel good, yes.

Q      Okay.  Do laundry if you feel good?

A      Yeah.

Q      Belong to any clubs, organizations, churches, lodges or attend meetings?

A      I am one of Jobs Witnesses.

Q      Do you attend church?

A      If I feel good, yes.

Q        And how often are you - - do you find yourself in a service?

A        Well, we have meetings three times a week but if I don't feel good like when a meeting comes then I just - - I don't go.

Q        How long are your services - - meetings?

A        Those - - an hour.  On average.  An hour, an hour and a half.

Q        Different days?

A        Yes.  And that is the only club or group you know, that I belong to.  I don't belong to anything else.

*                    *                    *

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 200)

Q        When you think back over milestones like graduations and birthday parties and things like that what comes to mind?

A        Being sick.  At my graduation party we had it at the park under shade trees.  We thought that would be a good idea.  And I got sick and I had to leave my graduation party like not even halfway through it, so everyone went on and had my graduation party.  And my sister's graduation party everyone had their graduation party and I was sick then too and I had to go home and - - family reunions I don't ever go to a family reunions very often because they're always outside in the middle of the summer and you know, hot and - -

Q        Are you able to go - - you know, like you said you're 20 years old.  Do you go out with friends and do things like I don't know, maybe your friends are doing?

A        No.  I mean, the other day friends invited us to go to the fair and it was just so hot and out there in the middle of the field and I already had a headache and my sister went and it

15

was just - I don't know.  Being left behind like that it's just - - and that happens all the time.  I mean - - and I can never plan on anything.  They ask you know, you want to go to the movies Friday and I'll say I don't.  You know, I'll - - if I feel good then  then I'll go but then it turns out I don't feel good and then that's just the way it always is.

Q      Now, if you had a job that was a full-time job would you run into that same problem?

A      Yes, I would.  Because I - - I mean, if I can't be dependable for my family I mean -

Q      You mentioned that you have actual migraine headaches 12 days a month and I think that was an - -

A      Yeah.

Q      - - estimate that you have.  On those 12 days would you be able to go to a job regardless of how easy the job might be?

A      No.  Because I estimated - - that was my estimation of the worst headaches I'm having and whenever I have those headaches I have got to have complete silence and I have to lay down or I'm going to get sick, throwing up sick.  And whenever that happens I - - that I have such a hard time making it stop because it's just like endless.  I mean, I know it's gross to say that stuff but it's just - - that's just the way it is.

Q      Are those the days that you describe being in your dark room?

A      Yes. Yes, and sleeping.  And I can't move my head because if I move my head it just makes it worse and I just feel so nauseous.  And I don't even really understand the connection between a migraine and feeling nauseous but - - you know, being sick but it's there.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 204)

Q       All right.  It appears that we have a young lady between the ages of 19 to 20 years of age.  She's a younger individual with a high school diploma earned through home schooling accredited and no past relevant work.  Assume the hypothetical of no physical exertional limitations.  However, such an individual should never climb any ladders, ropes or scaffolds. Such an individual should avoid concentrated exposure to temperature extremes primarily heat in her case, noise, vibration, fumes, odors, dust, gases and pollutants.  And avoid all exposure to the hazards of moving plant machinery and unprotected heights.  Now, with that hypothetical can you identify work in the national or regional economy that such an individual could perform and of course define the region.  And I'm interested if you could - - if work exists in more than one exceptional category provide all the exceptional categories that you could find work for such an individual.

A       Yes.  Could I have a moment or two, Your Honor?

Q       Sure.

A       I'm ready, Your Honor.

Q       All right.  Sir, you may proceed.

A       Your Honor, considering the hypothetical you've given me, which you're requesting that I consider all exceptional levels and also the other factors in your hypothetical it would be my testimony that jobs would exist in the national economy.  Also in the economy of the state of West Virginia.  At the medium level the position of a visiting homemaker at the medium level.  These are individuals who visit homes and take care of various patients.  It's

17

unskilled. 100,000 minimally in the U.S. 1,000 jobs in the state of West Virginia. Also at the medium level a position of a stock clerk at a warehouse. 146,000 jobs in the national economy. At least 1,100 in the state of West Virginia. At the light level a position of a cashier. 3,000,000 jobs in the national economy. At least 20,000 jobs in the state of West Virginia. At the sedentary level the position of a information clerk. 200,000 jobs in the national economy. At least 1,800 in the state of West Virginia. And also at the sedentary level the position of a surveillance system monitor operator. 300,000 jobs in the national economy and at least 1,000 jobs in the state of West Virginia. All are consistent with the DOT.

Q        If the claimant's testimony is considered completely credible and supported by her medical evidence of record so as to include even sedentary work activity and no ability to maintain attention and concentration to do even simple, unskilled work. If that be the case would all jobs be eliminated?

A        Yes, Your Honor.

Q        Is all the testimony you've given me today consistent with the Dictionary of Occupational Titles?

A        Yes, sir.

                        *                *                *

[EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY] (Tr. 207)

ATTY        Thank you, Your Honor. Mr. Panza, just a quick question here. If a person had no exceptional limits - - I mean, if we said that they could work at the very heavy level but they were going to miss 12 days of work per month would that provide for any type of jobs in the national economy?

VE               No, sir.

ATTY          Okay.

VE               There would no jobs.

ATTY          One follow up, Mr. Panza.  In the types of jobs that we've discussed here today, how - - what is the customary number of days per month that a person could miss and remain employable?

VE               Usual standard - - unwritten standard is one and one-quarter days on the average per month of absenteeism and if that isn't directed or remediated [phonetic] after six months the individual is terminated.  And approximately one day of absence per month is tolerated on a normal basis.

*             *             *

E.        <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

• Lives in a house with family.  (Tr. 87)

• Stays in bed if has a headache; if does not have a headache she gets up and tries to live a normal life, including:  (Tr. 87)

    • Feeds a dog and cat daily.  (Tr. 88)

    • Able to attend to personal care and hygiene.  (Tr. 88)

    • Prepares sandwiches and frozen food.  (Tr. 89)

    • Prepares food on weekly basis.

- Cleans house every other week.  (Tr. 89)

- Does laundry on weekly basis.  (Tr. 89)

- Washes dishes every other day.  (Tr. 89).

- Goes outside daily.  (Tr. 89)

- Drives a car.  (Tr. 89)

- Shops in stores, every other week for an hour and a half, for personal and household items.  (Tr. 90)

- Able to pay bills, count change, handle a savings account, use a checkbook/money order.  (Tr. 90)

- Reads, sews, and engages in religious involvement as often as she is able.  (Tr. 90)

- Visits friends at their homes and at religious activities.  (Tr. 91)

- Goes to Kingdom hall, the library, and social groups three times a week.  (Tr. 91)

- Has difficulty completing tasks and concentrating due to headaches.  (Tr. 92)

- Can pay attention for "normal" amount of time.  (Tr. 92)

- Has "no problem" following instructions.  (Tr. 92)

- Has " no problem" following spoken instructions.  (Tr. 92)

- Has "no problem" getting along with authority figures.  (Tr. 93)

- Handles stress "surprisingly well."  (Tr. 93)

- "Not so good" at handling changes in routine. (Tr. 93)

- Able to drive a car.  (Tr. 182)

- Has no limitations on ability to walk, stand, bend over, stoop down, and squat.  (Tr. 190)

- Has no limitations with hands, fists, fingers. (Tr. 190)

- Does not have any limits on lifting unless she has a headache. Then, cannot lift anything. (Tr. 191)

- Does not have any limitations on sitting unless she has a headache. In that event, sitting makes her headache worse. (Tr. 191)

- Watches TV unless she has a headache. (Tr. 193)

- Uses computer at library once every couple of weeks. (Tr. 193)

- Has no difficulty being around other people or strangers. (Tr. 193)

- Sleeps nine hours per night, on average. (Tr. 194)

- Tends to a flower garden when she does not have a headache. (Tr. 195)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant alleges the ALJ erred in determining her RFC and in the hypothetical posed to the VE because the ALJ failed to make any mention of Claimant's need to periodically miss work. Claimant also alleges the ALJ failed to consider Dr. Gingold's opinions and erred in assessing Claimant's credibility regarding her allegations of the frequency and severity of her headaches. Commissioner argues the ALJ properly determined Claimant's RFC and posed a proper hypothetical to the VE. Commissioner further argues the ALJ properly discredited Dr. Gingold's opinions and properly assessed Claimant's credibility.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 569©. The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2. Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §§ 405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3. Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. §§ 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4. Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. Disability Prior to Expiration of Insured Status- Burden. In order to receive

disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423©; Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.     Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     Social Security - Scope of Review - Weight Given to Relevant Evidence. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe

impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

    1.      Whether the ALJ Failed to Include All Claimant's Limitations In Her RFC and
         in the Hypothetical to the VE.

Claimant alleges the ALJ erred in determining her RFC and in the hypothetical to the VE because he failed to make any mention of her need to periodically miss work due to her migraine headaches.  Commissioner contends the ALJ's determination of Claimant's RFC and the hypothetical to the VE is supported by substantial evidence.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC.  20 C.F.R § 404.1520.  The RFC is what a claimant can still do despite her limitations.  Id. at § 404.1545.  More specifically, it is an assessment of a claimant's functional limitations resulting from medically determinable impairments (or combination of impairments) and includes the impact of related symptoms such as pain.  SSR 96-8p (1996).  The determination of a claimant's RFC is based upon all of the relevant evidence.  20 C.F.R. § 404.1545.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps

a claimant from performing particular work activities.  Id.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting forth all of Claimant's impairments in the hypothetical posed to the VE.  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996).  In other words, the hypothetical must "adequately reflect" a persons's impairments.  Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).  However, the ALJ's hypothetical need only include those limitations supported by the record.  Id.  The limitations and impairments included in the hypothetical should reflect the Claimant's RFC.   20 C.F.R. § 404.1545, SSR 96-8p.

The ALJ in the present case determined Claimant suffered from "severe" migraine headaches and determined Claimant retained the following RFC: "[N]o limitations on her ability to perform the physical requirements of work activity.  However, nonexertionally, due to headaches, she should avoid concentrated exposure to vibration, noise, fumes, pollutants, and temperature extremes, especially heat, she should avoid all exposure to unprotected heights and hazardous machinery, and she should never climb ropes, ladders, or scaffolds.  (Tr. 19).

At the hearing, the ALJ posed the following hypothetical to the VE: "Assume the hypothetical of no physical exertional limitations.  However, such an individual should never climb any ladders, ropes, or scaffolds.  Such an individual should avoid concentrated exposure to temperature extremes primarily heat in her case, noise, vibration, fumes, odors, dust, gases and pollutants.  And avoid all exposure to the hazards of moving plant machinery and unprotected heights."  (Tr. 205).  While the VE responded work existed in the national economy for such an individual, the VE said work did not exist that would accommodate that individual's need to miss 12 days of work per month.  (Tr. 207).

Finally, in his decision, the ALJ concluded Claimant suffered from "a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, but that the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 19). In coming to his conclusion, the ALJ partially relied on lifestyle evidence Claimant retained the ability to sew, garden, and complete household chores, amongst other activities. (Tr. 20).

The Court finds the ALJ's determination of Claimant's RFC and the hypothetical posed to the VE was erroneous for two reasons. First, the ALJ failed to demonstrate he discharged his duty to consider all relevant evidence. See Jordan v. Califano, 582 F.2d 1333, 1335 (4th Cir. 1978); see, also, SSR 96-8p. More specifically, the ALJ failed to demonstrate he considered Claimant's testimony that she retained the ability to do the above activities only on days she was not confined to bed by a headache. (Tr. 195, 197). As explained by Claimant in her Function Report dated February 2005, "if I have a headache, I stay in bed. If I don't have a headache, I get up and try to live a normal life." (Tr. 87). Similarly, at the hearing, Claimant explained, "if I wake up with a headache then I'll go and take my daily pills and . . . I'll go back to bed [] because that's what I have to do. . . . But if I don't have a headache then I just live like a normal person." (Tr. 195). Without assurance the ALJ considered the critical exception to Claimant's lifestyle evidence, the Court cannot determine whether the ALJ's determination of Claimant's RFC is supported by substantial evidence. Jordan, 582 F.2d at 1335. Accordingly, the case is remanded.

Second, the ALJ's failure to include in the RFC or the hypothetical Claimant's need to miss work - even for one day - due to headaches is not supported by substantial evidence.

Although the record leaves undetermined the exact frequency and severity of Claimant's headaches,[6] there is not substantial evidence to support the ALJ's complete disregard for Claimant's need to miss work. Rather, the ALJ himself determined Claimant suffered from severe migraines and the evidence shows Claimant has been repeatedly diagnosed with migraine headaches, has made consistent statements regarding her need to stay in bed on occasion due to headaches, has been prescribed numerous medications to control and prevent her headaches, and was found credible by the DDS physician in March 2005. (Tr. 125-129, 130, 141 166). The case must be remanded for further consideration of Claimant's RFC and discussion of the evidence suggesting Claimant may need to miss work.

2. <u>Whether the ALJ Failed to Properly Discuss the Dr. Gingold's Opinion and the Medical Evidence</u>.

Claimant alleges that ALJ erred by failing to consider Dr. Gingold's opinions. Commissioner argues the ALJ properly discredited Dr. Gingold's opinion.

A treating physician's opinion will be entitled to controlling weight under some circumstances. The opinion must be (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the

---

[6] Claimant's own reports regarding the frequency of her headaches are at times inconsistent. For example, in November 2004, Claimant reported to Dr. Gingold she experienced 1 severe and 3 smaller headaches weekly. (Tr. 125). Just one month later, however, Claimant reported to Dr. Dawlah she gets headaches almost 5 out of 7 days a week but that most of these headaches are not as severe or debilitating. (Tr. 130). Finally, at the hearing in September 2006, Claimant testified she experiences on average 12 headaches per month. (Tr. 188). In addition to the inconsistency in Claimant's own reports, medical opinions vary on the severity of Claimant's migraines. While Dr. Gingold, in November 2004, concluded Claimant's headaches rendered her unable to work more than two hours per day, the DDS physician in March 2005 concluded Claimant was able to work and the DDS physician in October 2005 concluded Claimant's migraines did not meet or equal a Listing. (Tr. 125, 131, 141).

case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). An ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record. Gordon, 725 F.2d at 235. Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments remains with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ's findings will be upheld as long as substantial evidence supports them. Hays, 907 F.2d at 1456. Furthermore, while the ALJ does not have a duty to document his consideration of every piece of evidence, see Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995), he does have a duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). Finally, the ALJ "must indicate explicitly that such evidence has been weighed and its weight." Jordan, 582 F.2d at 1335 (citing Arnold v. Secretary of H.E.W., 567 F.2d 258, 259 (4th Cir. 1977).

The Court finds the ALJ in the present case failed to sufficiently document his consideration of Dr. Gingold's medical opinion. Dr. Gingold treated Claimant on four occasions between November 2002 through November 2004. (Tr. 125-129). During her period of treatment, Claimant reported experiencing between one to four headaches per week. (Tr. 128, 125). In November 2004, during Claimant's last visit to Dr. Gingold, Dr. Gingold concluded Claimant has "intractable migraines in spite of being on numerous medications for good trial periods," was in a "good period," but was "unable to work for more than two hours a day." (Tr. 125). Dr. Gingold then recommended Claimant apply for disability. (Id.). The ALJ's

consideration of Dr. Gingold's records and opinions consisted only of referencing Exhibits 1E-3F, (Dr. Gingold's treatment records), and broadly noting Claimant's history of treatment for migraines, that her headaches responded to some of the prescribed medications, and that medical care has been "intermittent and routine in nature." (Tr. 20). The Court finds such limited reference is insufficient to enable the Court to ensure the ALJ considered all relevant evidence. See Jordan, 582 F.2d at 1335. Although the Court agrees with Commissioner Dr. Gingold's opinions may not necessarily be entitled to controlling weight due to their internal inconsistencies and the lack of support in the record for a 2-hour per day work limit, it is not the Court's role to weigh the evidence. The case must be remanded for further consideration of Claimant's RFC in light of Dr. Gingold's opinions, specifically her opinion Claimant cannot work more than two hours per day.

      3.     Whether the ALJ Failed to Correctly Assess Claimant's Credibility

      Claimant argues the ALJ erred in assessing Claimant's credibility because he employed "selective citation" and misrepresented the record. Commissioner alleges the ALJ properly assessed Claimant's credibility because Claimant's allegations of the frequency of disabling headaches were inconsistent with the medical record.

      The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in Craig, 76 F.3d at 585. Under Craig, when a claimant alleges disability from subjective symptoms, she must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about her symptoms, in determining whether

the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's subjective complaints, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.  However, the absence of objective medical evidence establishing the severity or frequency of symptoms is not determinative.  SSR 96-7p; Hines v. Barnhart, 453 F.3d 559, 564 (4th Cir. 2006).  Rather, subjective evidence of symptoms, alone, can support a finding of disability.  Id.  If the ALJ does choose to discredit a claimant's statement, the ALJ must explain his reason for doing so.  SSR 96-7p.

The Court finds the ALJ in the present case did not properly assess Claimant's credibility.  Consistent with the first prong of Craig, the ALJ found Claimant suffered from a medically determinable impairment - migraine headaches - capable of causing her alleged symptoms of pain.  (Tr. 19).  Having found the first prong satisfied, the ALJ then had a duty to consider the medical evidence and Claimant's subjective complaints to determine the impact of Claimant's headaches on her ability to work.  Craig, 76 F.3d at 595.  Towards that end, the ALJ stated he "considered all symptoms and the extent to which the these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of SSR . . . 96-7p."  (Tr. 19).  He then discussed the medical evidence and Claimant's lifestyle evidence and concluded, "[t]hese findings and activities serve to convince the undersigned that the claimant's headaches do not occur with the frequency and severity she alleged and would not preclude the ability to perform work activity on a sustained basis."  The Court finds the ALJ's analysis under the second prong is flawed because the ALJ relied on a mischaracterization of Claimant's lifestyle evidence.  See Hines, 453 F.3d at 565 [holding the

ALJ erred by "selectively" citing evidence concerning tasks claimant was capable of performing while ignoring claimant's own testimony of his limitations in those tasks]. As explained above, the ALJ's characterization of Claimant's lifestyle evidence ignores Claimant's testimony that she retains the ability to engage in the majority of the activities only when not confined to her bed due to headaches. (Tr. 87, 195, 197). Accordingly, the case must be remanded for assessment of Claimant's credibility regarding the alleged frequency and severity of her headaches in light of a proper characterization of her lifestyle evidence.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED because the ALJ's determination of Claimant's credibility and resulting RFC was based in part on an improper characterization of Claimant's lifestyle evidence. Additionally, the ALJ failed to sufficiently document his consideration of Dr. Gingold's medical records. As a result of his failure, the Court cannot determine whether the ALJ's findings regarding Claimant's RFC are supported by substantial evidence. The Court makes the above recommendation recognizing it's role is to ensure the ALJ accurately considered all relevant evidence in arriving at his decision, not to suggest what his decision should be upon consideration of the evidence.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons stated above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to

which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 29, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE